KALPANA SRINIVASAN (237460)
ksrinivasan@susmangodfrey.com
OLEG ELKHUNOVICH (269238)
oeklhunovich@susmangodfrey.com
MICHAEL GERVAIS (330731)
mgervais@susmangodfrey.com
LEAR JIANG (338600)
ljiang@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California  90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150

CHANLER LANGHAM (*Pro Hac Vice to be submitted*)
clangham@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas  77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

Attorneys for Plaintiff,
Meta Platforms Inc

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| META PLATFORMS INC., a Delaware corporation,<br><br>                Plaintiff,<br>        v.<br><br>OCTOPUS DATA, INC.,<br><br>                Defendant. | Case No. _____<br><br>**COMPLAINT; DEMAND FOR JURY TRIAL** |

Plaintiff Meta Platforms, Inc. ("Meta") alleges the following:

10702382v1/017524

**INTRODUCTION**

1.     Since at least March 25, 2015, and continuing to the present, Defendant Octopus Data Inc., ("Octopus") has operated an unlawful service called Octoparse, which was designed to improperly collect or "scrape" user account profiles and other information from various websites, including Amazon, eBay, Twitter, Yelp, Google, Target, Walmart, Indeed, LinkedIn, Facebook and Instagram.

2.     Defendant's service used and offered multiple products to scrape data. *First*, Defendant offered to scrape data directly from various websites on behalf of its customers (the "Scraping Service").  *Second*, Defendant developed and distributed software designed to scrape data from any website, including Facebook and Instagram, using a customer's self-compromised account (the "Scraping Software").  Defendant's Scraping Software was capable of scraping any data accessible to a logged in Facebook and Instagram user.  And Defendant designed the "premium" Scraping Software to launch scraping campaigns from Defendant's computer network and infrastructure.  *Finally*, Defendant claimed to use and distribute technologies to avoid being detected and blocked by Meta and other websites they scraped.

3.     Defendant's conduct was not authorized by Meta and it violates Meta's and Instagram's terms and policies, and federal and California law.  Accordingly, Meta seeks damages and injunctive relief to stop Defendant's use of its platform and products in violation of its terms and policies.

**PARTIES**

4.     Plaintiff Meta is a Delaware corporation with its principal place of business in Menlo Park, California.  Meta operates, among other products, Facebook and Instagram.

5.     Defendant Octopus was incorporated in California on or about January 12, 2015, with its principal place of business in Diamond Bar, California.  Defendant operates through the

website octoparse.com.  Ex.1.  As of August 9, 2020, Yusheng Li and Ting Li are the Chief Executive Officer and the Chief Financial Officer of Octopus, respectively.  Ex. 2.  According to its website, Defendant encouraged the use of the Scraping Software to "fetch all types of social media data across major players like Facebook, Twitter, Instagram, YouTube, Flickr…."  Ex. 3.  And Defendant promoted the Scraping Software as a way to "quickly scrape web data without coding."  Ex. 4.  As of January 6, 2022, Defendant claimed that it had one million customers using its Scraping Services.  Ex. 5.

6.     Octopus is a U.S. subsidiary of Shenzhen Vision Information Technology Co., Ltd., also known as Shenzhen Skieer Information Technology Co. Ltd ("SVIT").  SVIT is located in Shenzhen, China.  Liu Baoqiang, also known as Keven Liu, is the founder and CEO of SVIT.  SVIT's website, skieer.com, describes SVIT as a "national high-tech enterprise that aims to build a big data platform and is committed to providing big data software and industry solutions."  *Id.*  SVIT was named a "national high-tech enterprise" by China's Ministry of Science and Technology in November 2015.

7.     On or about March 25, 2015, SVIT's CEO, Keven Liu, registered the octoparse.com domain under the name Liu Bao Qiang using Alibaba Cloud Computing (Beijing) Co., Ltd.  Ex. 6.  By March 21, 2018, the registration was anonymized using privacy guard and information about the registrant was no longer publicly available.  Ex. 7.

8.     SVIT's CEO promoted the Scraping Software on Facebook through his personal Facebook account.  Several Octopus employees or those acting on its behalf created user accounts on Facebook to also promote the Scraping Software on Facebook.

**JURISDICTION AND VENUE**

9.     The Court has federal question jurisdiction over the federal causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1331.

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.

10702382v1/017524

10. The Court has supplemental jurisdiction over the state law causes of action alleged in the Complaint pursuant to 28 U.S.C. § 1367 because these claims arise out of the same nucleus of operative facts as Facebook's federal claim.

11. Defendant had multiple Facebook accounts and thereby agreed to Meta's Terms of Service and Commercial Terms (collectively "Meta's Terms"). The Court has personal jurisdiction over Defendant because Meta's Terms contain a forum selection clause that requires this complaint be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, and that Defendants submit to the personal jurisdiction of either of those courts.

12. Defendant had multiple Instagram accounts and thereby agreed to the Instagram Terms of Use. The Instagram Terms of Use contain a forum selection clause that requires this complaint be resolved by this Court, and that Defendant submit to the personal jurisdiction of this Court.

13. Additionally, the Court has personal jurisdiction over Defendant because it knowingly directed and targeted its conduct at California and at Meta, which has its principal place of business in California. Defendant is also incorporated in California and is located in Diamond Bar, California.

14. By agreeing to the forum selection clause in Meta's Terms and Instagram's Terms of Use, Defendant agreed that this Court is the proper venue for this matter.

## FACTUAL ALLEGATIONS

A. **Background on Facebook and Instagram**

15. Facebook is a social networking website and mobile application operated by Meta that enables its users to create their own personal profiles and connect with each other on their

personal computers and mobile devices.  As of March 31, 2022, Facebook daily active users averaged 1.96 billion and monthly active users averaged 2.94 billion.

16.     Instagram is a photo and video sharing service and mobile application.  Instagram users can upload photos and videos to Instagram and share them with others.  They can also view and comment on photos and videos shared by others on Instagram.

17.     To create a Facebook or Instagram account, Meta requires each user to register with a unique username and password.  Registered users can create user profiles and include information about themselves, including their email address, phone numbers, and date of birth.  Registered Facebook users can make connections on Facebook by becoming "friends" with other Facebook users and Instagram users can "follow" other Instagram users.

18.     Meta provides Facebook and Instagram users control over how to customize their profiles and how much personal information to include in their profiles.  In addition, Facebook and Instagram privacy settings provide users with control over how much information is viewable publicly, to other Facebook and Instagram users, or to the users' friends and followers.

**B.**     **Meta and Instagram Terms and Policies**

19.     All Facebook users must agree to Meta's Terms of Service (available at https://www.facebook.com/terms.php) ("Meta Terms") and other rules that govern access to and use of Facebook (collectively "Meta Terms and Policies").

20.     Everyone who uses Instagram agrees to Instagram's Terms of Use ("Instagram Terms") and to other rules that govern access to and use of Instagram, including Instagram's Community Guidelines and Platform Policy (collectively, "Instagram Terms and Policies").

21.     Section 3.3 of the Meta Terms provide that its users "own the intellectual property rights (things like copyright or trademarks) in any such content that [they] create and share on Facebook and other Meta Company Products [they] use."

22.    Instagram's Terms also provide that Instagram users have content that is "covered by intellectual property rights (like photos and videos) . . . ."

23.    Instagram's Terms and Section 3.2.1 of the Meta Terms prohibits users from "do[ing] . . . anything unlawful, misleading, [ ] or fraudulent" or facilitate or support others in doing so.

24.    Section 3.2.3 of the Meta Terms prohibits "access[ing] or collect[ing] data from [Facebook] Products using automated means (without our permission) or attempt[ing] to access data you don't have permission to access." The Instagram Terms also prohibit (a) "access[ing] or collect[ing] in unauthorized ways . . . [including] collecting information in an automated way without our express permission;" and (b) "violat[ing] someone else's rights, including intellectual property rights."

25.    Section 4 of the Meta Terms provides that Meta has intellectual property rights in various images, designs, videos, and sounds created by Meta, and retains its rights in its shared protected material.

26.    Instagram's Terms also state that Instagram provides "content covered by intellectual property rights that we have and make available" and "retain all rights to our content."

**C.    Background on Scraping**

27.    Scraping is a form of data collection that relies on unauthorized automation for the purpose of extracting data from a website or app.

28.    To combat scraping and other abuse, Meta proactively uses a combination of technological measures designed to control access to Facebook and Instagram and to detect and disrupt scraping at different stages.

a.    Registration. Meta requires users of Facebook and Instagram to register for an account and login to the account before accessing and using the applications or websites. Meta

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.
10702382v1/017524

monitors for the automated creation of accounts and blocks the registration of an account when the process of creating the account appears suspicious or automated or related to scraping.

b.  <u>Confirmation</u>. After registering, Meta requires Facebook and Instagram users to respond to an email or text message Meta sends to the contact information provided during registration.  Meta also limits the number of user accounts that can share the same phone number or email address.

c.  <u>Post-Registration Monitoring for Suspicious Activity</u>.  Facebook and Instagram apply machine-learning models, using user-agent strings and other information, to detect accounts engaged in suspicious activity, such as inauthentic behavior, compromised accounts, and automated accounts after registration. If an account is flagged for suspicious activity on Facebook and Instagram, Meta may ask the user to enter a phone number, confirm a code sent to the registration email, or ask the user to respond to various technical tests or "checks," including reCAPTCHA, to confirm that he or she is a human. Similarly, Instagram also uses machine learning and other tools to help identify accounts engaged in inauthentic activity (i.e., likes, follows, and comments).  These accounts may be temporarily or permanently blocked from accessing Facebook and Instagram. For example, between January and March of 2022, Meta identified and took enforcement actions against 1.6 billion fake accounts.

d.  <u>Post-Registration Monitoring for Scraping</u>.  Meta also uses machine-learning models and other tools to detect and block users engaged in scraping based on use patterns that are inconsistent with a human user.  Meta also identifies and blocks IP addresses known to be used to scrape data.

e.  <u>Rate and Data Limits</u>.  Meta employs rate and data limits to control access to certain data and prevent scraping.  Rate limits cap the number of times anyone can interact with Meta computers in a given amount of time.  Data limits restrict how many times certain types of

data can be requested by a user.  Once a user reaches a rate or data limit Meta will block a user's ability to access certain content. Meta blocks billions of suspected scraping actions per day across Facebook and Instagram using these measures.

29.     Despite Meta's efforts to stop scraping and block scrapers from accessing Facebook and Instagram, data scrapers can utilize self-compromised user accounts to pose as an authenticated user, and other techniques (as described below in paragraph 49), to circumvent Meta's detection measures.

**D.      Defendant Accepted Meta's and Instagram's Terms and Policies**

30.     At all relevant times, Defendant was bound by Meta's and Instagram's Terms and Policies.

31.     Between November 10, 2016, and July 5, 2022, the CEO of Octopus, Yusheng Li created and controlled at least five Facebook user accounts and one Instagram account:

a.       Defendant created a Facebook account on April 3, 2015, with the username "Li Isabel."

b.      Defendant created a Facebook account on November 10, 2016, with the username "Isabel Li."

c.       Defendant created a Facebook account on March 1, 2017, with the username "Isabel Li."

d.      Defendant created a Facebook account on September 27, 2017, with the username "Yina Huang."

e.       Defendant created a Facebook account on March 4, 2018, with the username "Isabel Li."

32.     Defendant created an Instagram account on July 18, 2018, with the name "isabellaoscar001."

33.     Between December 16, 2007 and July 5, 2022, the CFO of Octopus, Ting Li created and controlled at least one Facebook user account with the name Bernice Li.

34.     Between April 8, 2012 and July 5, 2022, the CFO of Octopus, Ting Li created and controlled at least one Instagram accounts with the name isabella_angella.

35.     Between September 26, 2014 and July 5, 2022, the CEO of SVIT, Keven Liu created and controlled at least one Facebook user account with the name "Keven Liu".

36.     On or about March 17, 2016, Defendant, through its employees and agents, created a Facebook user account with the name "Octoparse."

37.     Between 2016 and 2021, Defendant, through its employees and agents, created and administrated five Facebook Pages, Octoparse Japan, Octoparse Español, Octoparse Français, Octoparse, and Octoparse Deutschland.  The Pages were also used to promote the Octopus Scraping Services.

38.     On or about April 5, 2016, Defendant through its employees and agents, created a Facebook Group with the name Octoparse Users Club.

39.     Between August 4, 2017, and July 5, 2022, Defendant, through its employees and agents created and controlled two Facebook advertising accounts.  Defendant used Facebook to promote Octoparse as set forth in Figure 1.

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.

10702382v1/017524

1

**Figure 1: November 20, 2019 Octoparse Advertisement on Facebook**



17   **E.**   **Defendant Octopus's Scraping Activity**

18   40.   Since at least March 25, 2015, Defendant has operated the website octoparse.com

19   where it (i) sold and distributed its Scraping Software designed to scrape data from Facebook,

20   Instagram, Twitter, YouTube, and other websites; (ii) promoted scraping data from Facebook and

21   Instagram (and any other website) for its customers; and (iii) developed, used, and distributed

22   technologies to circumvent Meta's technological measures designed to detect and disrupt scraping

23   of Facebook and Instagram.

24

25   41.   Defendant charged a range of prices for its Scraping Service and Software.   As

26   shown in Figure 2 below, Defendant developed and distributed a free and premium version (split

27   between a Standard Plan and a Professional Plan) of its Scraping Software.   Defendant also sold its

28

10702382v1/017524

Scraping Service as part of the premium version of the Scraping Software and as a standalone product starting at $399.

**Figure 2: May 24, 2021 Screenshot of Octoparse Premium Pricing & Packaging on octoparse.com**



10702382v1/017524

*i.*      *Octoparse Scraping Software*

42.     To obtain and use the free or premium version of the Scraping Software, Defendant required all customers to create an account on Defendant's website octoparse.com.  Defendant required customers to register using an email address and to create an Octoparse username and password.  After a customer registered on Defendant's website, a customer was required to select the free or premium version of the Scraping Software and download it to their computer.

43.     Defendant's website also enabled customers to add profile information (such as name and industry in which they worked), manage their subscriptions and purchase history with Defendant, and refer others to use Octoparse.

44.     After a customer downloaded the Scraping Software to their computer, the customer was required to login to their Facebook or Instagram account.  Once logged in, Defendant designed the Scraping Software (free and premium versions) so that the customer only had to click on the data they wanted to scrape from Facebook and Instagram to facilitate Defendant's scraping activities.  Defendant designed the free version of the Scraping Software to exfiltrate scraped data to the customer's computer.  Defendant designed the premium version of the Scraping Software to exfiltrate the scraped data to servers controlled by Defendant.  Defendant stored the data scraped by its premium version on its servers for a minimum of three months by default.

45.     Defendant further facilitated scraping by allowing customers to schedule and launch scraping actions, without the customer visiting and browsing Facebook or Instagram, using IP addresses and servers controlled by Defendant.  To circumvent Meta's security requirement that a user enter a username and password, Octoparse required customers to first login to Facebook and Instagram and send their user authentication information to Defendant.  By doing this, the user self-compromised their Facebook and Instagram accounts.   Defendant then used the user's

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.

authentication information to access Meta's computers, while pretending to be the legitimate Facebook or Instagram user, to make unauthorized automated requests for data.

ii.   *Octoparse Scraping Service*

46.   In addition to its Scraping Software, Defendant offered a full-service scraping option where Octopus employees and agents used Octopus computers, IP addresses, and other technology to scrape data from various websites and delivered it to its customers, as shown in Figure 3, below.   Defendant presented that it could scrape data "across all major players like Facebook, Twitter, Instagram, YouTube, Flickr…." Ex. 3.

**Figure 3: April 5, 2022 Description of Defendant's Scraping Service on octoparse.com**



**Get data effortlessly**

We get it. You want the data, not the headache.
Have peace of mind with the Octoparse data extraction service.

**Quick, hassle-free**

Flexible, and scalable With Octoparse web scraping service, we do all the work to make sure accurate data is delivered to your team. You don't have to build or maintain. Get data within days - not weeks or months.

**Flexible, and scalable**

The Octoparse data solution is ideal for projects of all sizes - one-time or recurring, from thousands of records to millions of records each day. Scale as you grow.

**Reliable, high quality data**

We have the experience and expertise to understand your requirements, solve any scraping issues and deliver exactly just that. No more data gaps and messy datasets.

**Usable, formatted data**

Ready-to-use data in Excel or CSV, or integrate with your database. Directly download via REST API. No more data gaps and messy datasets.

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.
10702382v1/017524

47.     As shown in Figure 4, Defendant promoted the Scraping Service by stating "Sit back and relax. We'll get the data you need, the way you want it!" Customers who wanted to use Defendant's Scraping Service were required to schedule a consultation with Defendant during which the customer provided the name of the website and a description of the data they wanted scraped.

**Figure 4: April 5, 2022 Screenshot Related to Defendant's Scraping Service from octoparse.com**



48.     According to Defendant's website, Defendant would assign an account manager to work one-on-one with the customer to confirm the scraping project specifications, and Defendant could build or maintain scraped datasets for a fee.

        iii.    *Defendant Designed Octoparse to Avoid Detection and Technological Measures*

49.     Defendant used, developed, manufactured, and offered to the public, scraping technology and services designed to circumvent Meta's technological measures that control access to data on Facebook and Instagram. According to Defendant's website,

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.
10702382v1/017524

a.      Defendant's premium version of the Scraping Software used an "IP Rotation" service that distributed large data requests across multiple IP addresses controlled by Defendant to avoid being detected and blocked.  Ex. 8.

b.      Defendant programmed the Scraping Software to use an "auto-rotating web browser" function to avoid machine learning models that detected suspicious activity and blocked accounts. Specifically, Defendant's website claimed that their Software could "reduce the risk of being blocked" by automatically rotating an internet browser's real user-agent with a series of fake user-agents.  The user-agent is information that identifies a user's browser, browser version, and computer operating system to a website.  Ex 9.   According to Defendant, "using a [single] user agent for an abnormally large number of requests will lead you to the block (sic) and to "get past the block, you should switch user-agent frequency instead of sticking to one." *Id.*

c.      Defendant's Scraping Service and the Scraping Software used "hundreds of cloud servers each with a unique IP address" when accessing and scraping data in order to prevent Meta from identifying and blocking Defendant's IP addresses.  Exs. 3, 8, and 9.

d.      Defendant designed the Scraping Software to "incorporate random clicks and mouse movements" to make the scaping activity appear to be human rather than bot activity to avoid detection and being blocked by Meta's technological measures.  *Id.*

e.      Defendant designed the Scraping Software to access and scrape data at different or even random time intervals "to make the [access and] the scraping more human-like" in order to avoid detection and being blocked by Meta's technological measures.  *Id.*

f.      As shown below in Figure 5, Defendant advertised that it used advanced anti-blocking tools like "handling login authentication, using automatic IP rotation, and resolving reCAPTCHA programmatically."   reCAPTCHA is a program designed to distinguish between human and automated access of a website.

**Figure 5: May 23, 2022 Screenshot of Defendant's Social Media Data Solutions
page on octoparse.com**



50.     Defendant provided guidance on how to evade detection and anti-scraping measures used by various websites, including Meta, on a blog titled, "How to Scrape Websites Without Being Blocked in 5 Mins" and video tutorials on the Official Octoparse YouTube Channel.[1]  Defendant's guidance to avoid detection included the techniques described in paragraph 51 above - using a proxy server, which would conceal the user's true IP address and altering the user's actual user-agent string.  Ex. 9.

51.     Defendant provided step-by-step guidance on using the Octoparse to scrape data from Facebook and Instagram and avoid technological measures intended to prevent scraping.  For example, as recently as on or about December 6, 2021, a video posted by Octoparse to its official YouTube Channel is titled, "How to scrape Facebook accounts with Octoparse" and instructs

---

[1] Located at https://www.youtube.com/watch?v=B4VPmdteI5A

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.

10702382v1/017524

viewers on how to use Octoparse Scraping Software to extract data from Facebook.[2]  Another

tutorial titled, "Scrape data from Instagram (Version 8.4)" was posted on or about November 2021

to the help center on octoparse.com and provides instructions on how to scrape data from

Instagram.[3]  Both tutorials direct customers to save their authentication information in the

Octoparse Scaping Software or Meta will "block" the scraping activity.

**F.**      **Meta's Enforcement Efforts**

52.      In July 2022, Meta took various technical enforcement measures against Defendant,

including disabling Facebook and Instagram accounts and Pages associated with Defendant.

**G.**      **Defendant Was Unjustly Enriched and Its Unlawful Acts Have Caused Damage
and a Loss to Meta**

53.      Defendant's violations of Meta's and Instagram's Terms and Policies have harmed

Meta.

54.      Meta suffered damages attributable to the efforts and resources it used to investigate

and remediate Defendant's conduct in an amount to be determined at trial.

55.      Since at least March 2015, Defendant has unjustly enriched itself at Meta's expense

in an amount to be determined at trial.  Meta is entitled to an accounting by Defendant and a

disgorgement of all unlawful profits gained from their conduct.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

56.      Meta realleges and incorporates all preceding paragraphs here.

---

[2] Located at https://www.youtube.com/watch?v=dxKTTKlBTQo

[3] Located at https://helpcenter.octoparse.com/hc/en-us/articles/4407753230617-Scrape-data-from-
Instagram-Version-8-4-

10702382v1/017524

57.     Since at least March 25, 2015, Defendant, through their employees and agents, created and used multiple Facebook and Instagram accounts and thereby agreed to Meta's and Instagram's Terms and Policies.   Meta's and Instagram's Terms and Policies constitute an agreement between Defendant and Meta.

58.     Meta has performed all conditions, covenants, and promises required of them in accordance with Meta's and Instagram's Terms and Policies.

59.     Since at least March 25, 2015, Defendant offered and sold its Scraping Software and Scraping Services on the website octoparse.com.

60.     Defendant engaged with Facebook and Instagram in unauthorized ways.

61.     Defendant has breached and continues to breach Instagram's Terms and Meta Terms 3.2.1, 3.2.2, and 3.2.3.   Meta's Terms prohibit (a) using automated means without Meta's permission to scrape data from Facebook and Instagram; (b) facilitating others to scrape data from Facebook and Instagram without Meta's permission through Octoparse; and (c) violating the intellectual property rights of others by scraping copyright protected data.   Instagram's Terms also prohibit the same conduct.

62.     Defendant's many breaches have caused Meta to incur damages, including investigative costs, in an amount to be proven at trial.

63.     Meta likewise seeks injunctive relief.   As a direct result of Defendant's unlawful actions, Meta has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

## **SECOND CAUSE OF ACTION**

### (Unjust Enrichment)

64.     Meta realleges and incorporates all paragraphs previously alleged here.

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.

10702382v1/017524

65.     Defendant's acts as alleged herein constitute unjust enrichment by the Defendant at Meta's expense.

66.     Defendant accessed and used Meta's services, platforms, and computer networks to, among other things, scrape data from Facebook and Instagram in violation of Meta's and Instagram's Terms.

67.     Defendant received a benefit by profiting from their wrongful conduct, including from scraping data from Facebook and Instagram and facilitated the same through Octoparse.  But for Defendant's wrongful and unlawful use of Facebook and Instagram, they would not have obtained such profits.

68.     Defendant's retention of the profits derived from violating Meta's and Instagram's Terms would be unjust.

69.     Meta seeks an accounting and disgorgement of Defendant's ill-gotten profits in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

(Digital Millennium Copyright Act ("DMCA") 17 U.S.C. § 1201)

70.     Meta realleges and incorporates all paragraphs previously alleged here.

71.     Defendant violated 17 U.S.C. § 1201.

72.     Meta's Facebook product is copyright protected.

73.     Certain user generated content is also copyright protected and users grant Meta a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of that content consistent with the user's privacy and application settings.

74.     Meta uses technological measures designed to detect and disrupt automaton and scraping and that also effectively control access to Meta's and users' copyright protected works,

including requiring users to register for an account and login to the account before using those products, monitoring for the automated creation of accounts, monitoring account use patterns that are inconsistent with a human user, employing a reCAPTCHA program to distinguish between bots and human users, identifying and blocking of IP addresses of known data scrapers, disabling accounts engaged in automated activity, and setting rate and data limits.

75.     Defendant has circumvented and is circumventing technological measures that effectively control access to copyright protected works and those of its users on Facebook and Instagram and/or portions thereof.

76.     Defendant manufactures, provides, offers to the public, or otherwise traffics in technology, products, services, devices, components, or parts thereof, that are primarily designed or produced for the purpose of circumventing technological measures and/or protection afforded by technological measures that effectively control access to copyright protected works and/or portions thereof.

77.     Defendant's Octoparse Scraping Services or parts thereof, as described above, have no or limited commercially significant purpose or use other than to circumvent technological measures that effectively control access to Meta and its user's copyrighted works and/or portions thereof in order to scrape copyright protected data from Facebook and Instagram.

78.     Meta has been and will continue to be damaged in an amount not presently known with certainty, but which will be proven at trial.

79.     Defendant's conduct also has caused irreparable and incalculable harm and injuries to Meta, and, unless enjoined, will cause further irreparable and incalculable injury, for which Meta has no adequate remedy at law.

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.
10702382v1/017524

80.     Meta is entitled to the range of relief provided by 17 U.S.C. §§ 1201-1203, including, but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Meta's costs and attorneys' fees in amounts to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Meta seeks a judgment awarding the following relief:

a.      A permanent injunction enjoining and restraining Defendant and its agents from accessing and using Facebook and Instagram;

b.      A permanent injunction requiring Defendant to identify the location of any and all data obtained from Facebook and Instagram, to delete such data, and to identify any and all entities with whom Defendant shared such data;

c.      A permanent injunction enjoining and restraining Defendant and its agents from soliciting and facilitating others to scape data from Facebook and Instagram, in violation of Meta's and Instagram's Terms;

d.      A permanent injunction enjoining and retraining Defendant from developing, distributing, and using and enabling others to use technologies and products designed to scrape data from Facebook and Instagram without first obtaining Meta's express permission;

e.      A permanent injunction enjoining and retraining Defendant from circumventing technological measures that effectively control access to copyright protected works on Facebook and Instagram;

f.      A permanent injunction enjoining and retraining Defendant from developing, distributing, and otherwise traffic technology, products, services, devices, components, or parts thereof, designed to circumvent technological measures that effectively control access to copyright protected works on Facebook and Instagram;

g.      A permanent injunction requiring Defendant to identify all its customers

10702382v1/017524

that scraped data from Facebook and Instagram;

      h.     Compensatory damages in an amount to be proven at trial;

      i.     Pre- and post-judgment interest as allowed by law;

      j.     An accounting of Defendant's profits resulting from its scraping activity;

      k.     Disgorgement of Defendant's profits resulting from their scraping activity; and

      l.     All other equitable and legal relief the Court deems just and proper.

**PLAINTIFF RESPECTFULLY DEMANDS A JURY TRIAL.**

Dated: July 5, 2022           Respectfully submitted,

                           **SUSMAN GODFREY L.L.P.**

            By:    */s/ Kalpana Srinivasan*
                      KALPANA SRINIVASAN
                      CHANLER LANGHAM
                      OLEG ELKHUNOVICH
                      MICHAEL GERVAIS
                      LEAR JIANG

                      Attorneys for Plaintiff Meta Platforms, Inc.

                      ***Of Counsel:***

                      **META PLATFORMS, INC.**
                      **PLATFORM ENFORCEMENT AND LITIGATION**

                      Jessica Romero
                      V. RaShawn Woodley
                      Michael Chmelar

COMPLAINT; DEMAND FOR JURY TRIAL
Case No.

10702382v1/017524